UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

2311 RACING LLC d/b/a 23XI RACING *and* FRONT ROW MOTORSPORTS, INC.,

        Movants,

– *against* –

NATIONAL BASKETBALL ASSOCIATION, NATIONAL FOOTBALL LEAGUE, *and* NHL ENTERPRISES, L.P.,

        Respondents.

**OPINION & ORDER**

25-mc-00146 (ER)

---

RAMOS, D.J.:

    2311 Racing LLC and Front Row Motorsports, Inc. ("Plaintiffs") initiated this miscellaneous action to compel the National Basketball Association ("NBA"), National Football League ("NFL"), and NHL Enterprises, L.P. ("NHL") (collectively the "Leagues") to comply with third-party subpoenas in a case pending in the United States District Court for the Western District of North Carolina, *2311 Racing LLC, et al. v. National Association for Stock Car Auto Racing, LLC, et al.*, No. 3:24-cv-886 (KDB) (SCR) (W.D.N.C.) (the "North Carolina Action"). The Leagues are not parties to the North Carolina Action. For the reasons stated below, the motion to compel is DENIED.

**I.   BACKGROUND**

    **A.  Factual Background**

    Plaintiffs are premier stock car racing teams in the United States that compete in the National Association for Stock Car Auto Racing ("NASCAR") Cup Series, which is the top stock car racing circuit in the United States. Doc. 2 at 6. Plaintiffs filed the North Carolina Action on October 2, 2024, alleging that NASCAR and its CEO James ("Jim") France (together "Defendants") hold a monopoly "over the [] market for premier stock car racing [] [in the United States], which Defendants have willfully maintained by

anticompetitive conduct," in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. The North Carolina Action, Doc. 107 ("Amended Complaint") at 44.[1]

Plaintiffs specifically allege that NASCAR, among other things, "requires teams to enter into non-compete provisions to participate in Cup Series races …; requires teams to sign a release of claims, which NASCAR argues waives teams' right to challenge NASCAR's monopoly under federal antitrust law … ; acquired its closest competitor … ; and has used acquisitions and exclusive deals to lock up the racetracks that are most capable of hosting premier stock car races." Doc. 2 at 8; *see* Amended Complaint ¶¶ 12, 14, 78, 84–91, 96–98, 115. Plaintiffs further allege that "[a]bsent Defendants, a competitive market would have yielded significantly better terms for Plaintiffs to compete in the but-for world, either in NASCAR or in a competitive series." Amended Complaint ¶ 128.

On February 19, 2025, Plaintiffs served third-party subpoenas on the Leagues under Federal Rule of Civil Procedure Rule 45. *See, e.g.*, Docs. 32-1, 32-2.[2] Plaintiffs specifically seek information "showing team and [L]eague revenues and how those revenues are split between the [L]eague and its teams." Doc. 2 at 7. Plaintiffs request four categories of information:

- Documents sufficient to show the revenues (e.g., media, ticket, concession, etc.) that are shared with or among the [L]eague and its teams.
- A declaration or documents sufficient to show the formula for the split among the teams and [L]eague for the revenue categories.
- A declaration or documents sufficient to show the amounts of revenues shared with or retained by the [L]eague and the teams.

---

[1] On December 18, 2024, the district court in the North Carolina Action entered a limited preliminary injunction, finding that Plaintiffs had shown a likelihood of success on their Sherman Act claim as it relates to the release provision for past conduct in the 2025 charter agreement between NASCAR and the racing teams. The North Carolina Action, Doc. 74 at 15, 19–20. On June 5, 2025, the Fourth Circuit vacated the injunction, concluding that Plaintiffs did not make "a clear showing that they were likely to succeed on the merits" on the theory that "a business entity or person violates the antitrust laws by requiring a prospective participant to give a release for past conduct as a condition for doing business." *Id.*, Doc. 151 at 9–10.

[2] Plaintiffs have modified the requested information since the original subpoenas were served. Doc. 2 at 9–11.

- Documents sufficient to show the valuations of expansion or current teams.

*Id.* at 10.  The timeframe for the documents is from January 1, 2016 to December 31, 2024.  *Id.*[3]  Plaintiffs note that the "timeframe corresponds with the execution of the 2016 agreement between NASCAR and its chartered teams, in which NASCAR exercised its monopoly power to impose the anticompetitive terms that Plaintiffs are challenging in the [North Carolina Action]."  *Id.*

Plaintiffs argue that the subpoenas "seek financial information relevant to proving antitrust injury and calculating the damages incurred by Plaintiffs under the 'yardstick' measure of estimating damages in an antitrust litigation."  *Id.* at 7.  Plaintiffs further argue that the information "will enable Plaintiffs to perform a yardstick comparison between the other major professional sports leagues (where competition is not precluded) and NASCAR (where exclusionary conduct has been used to unlawfully maintain a monopoly)."  *Id.*

Plaintiffs note that the Leagues "are joint ventures owned by the teams—unlike NASCAR, which has long been controlled by the France family."  *Id.* at 9.[4]  Plaintiffs argue that "[b]ecause the teams in the [Leagues] are not subject to a monopolistic league owner, they get competitive market terms with respect to the sharing of revenues and other economic items."  *Id.*

In the North Carolina Action, fact discovery is scheduled to close on June 30, 2025, and trial is set to beginning on December 1, 2025.  *Id.* at 6.

### B.  Procedural History

On March 31, 2025, Plaintiffs initiated this miscellaneous action to compel the Leagues to comply with third-party subpoenas.  Doc. 1.[5]  On May 1, 2025, the Leagues

---

[3] Plaintiffs agreed to shorten the timeframe after a meet and confer with the Leagues.  Doc. 2 at 10.

[4] According to the Amended Complaint in the North Carolina Action, NASCAR—founded by William H.G. "Big Bill" France Sr. in 1948—"has always been privately owned by the France family, including the current CEO and Chairman [Jim] France."  Amended Complaint ¶¶ 3, 43–44.

[5] On March 28, 2025, the NFL and NBA agreed to produce their bylaws, Constitutions, and collective bargaining agreements.  Doc. 2 at 10–11.

filed their memoranda of law in opposition, and on May 9, 2025, Plaintiffs filed their reply. Docs. 25, 29, 36.

## II.     LEGAL STANDARD

A party who has properly served a subpoena "may move the court for the district where compliance is required for an order compelling production or inspection." Fed. R. Civ. P. 45(d)(2)(B)(i). "Motions to compel compliance with Rule 45 subpoenas are governed by the relevancy and proportionality guidelines of Rule 26." *Delta Air Lines, Inc. v. Lighthouse Group, LLC*, No. 21-mc-374 (RA) (OTW), 2021 WL 2117247, at *2 (S.D.N.Y. May 24, 2021). Parties thus may obtain discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).

Relevancy "is an extremely broad concept" and needs only be "reasonably calculated to lead to the discovery of admissible evidence." *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 298 F.R.D. 184, 186 (S.D.N.Y. 2014) (quoting *Condit v. Dunne*, 225 F.R.D. 100, 105 (S.D.N.Y. 2004)). There is a "'relatively low threshold' for a party to show that the material sought is relevant to any claim or defense in the litigation." *Id.* (quoting *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 421 (E.D.N.Y. 2007)).

"Proportionality [] 'focuses on the marginal utility of the discovery sought.'" *New Falls Corp. v. Soni*, No. 16-cv-6805 (ADS) (AKT), 2020 WL 2836787, at *2 (E.D.N.Y. May 29, 2020) (citation omitted). Indeed, "even relevant information must be 'reasonably proportional to the value of the requested information, the needs of the case, and the parties' resources.'" *Id.* (citation omitted).

"The party issuing the subpoena bears the initial burden of showing that the discovery sought falls within the scope of Rule 26(b)(1)." *Joint Stock Company Channel One Russia Worldwide v. Infomir LLC*, No. 16-cv-1318 (GBD) (BCM), 2018 WL 6712769, at *5 (S.D.N.Y. Nov. 30, 2018). The party opposing enforcement of the subpoena then bears the burden of establishing that "one of the grounds for quashing a

4

subpoena applies." *Malibu Media, LLC v. Doe*, No. 15-cv-3147 (AJN), 2016 WL 5478433, at *2 (S.D.N.Y. Sept. 29, 2016) (citation omitted).

A subpoena may be quashed (or motion to compel denied) because, among other grounds, it imposes undue burden, Fed. R. Civ. P. 45(d)(1) and (3)(A)(iv), or because it requires disclosure of "confidential research, development, or commercial information," Fed. R. Civ. P. 45(d)(3)(B)(i). "Whether a subpoena imposes an undue burden depends upon such factors as relevance, the need of the party for the documents, the breadth of the documents, the time period covered by it, the particularity with which the documents are described and the burden imposed." *In re Terrorist Attacks on Sept. 11, 2001*, 523 F. Supp. 3d 478, 489 (S.D.N.Y. 2021) (citing *Night Hawk Ltd. v. Briarpatch Ltd.*, No. 03-cv-1382 (RWS), 2003 WL 23018833, at *8 (S.D.N.Y. Dec. 23, 2003)). Where a party seeks disclosure of confidential commercial information, a court may order production only if the serving party satisfies its own burden to show "a substantial need" for the documents "that cannot be otherwise met without undue hardship." Fed. R. Civ. P. 45(d)(C)(ii). A non-party resisting discovery based on confidentiality must establish both that the information is confidential and that disclosure would be harmful to it. *American Home Assurance Co. v. Merck & Co.*, No. 03-cv-3850 (VM) (JCF), 2004 WL 2222148, at *2 (S.D.N.Y. Oct. 4, 2004). Ultimately, "the court must weigh the need for the information against the harm that would result from disclosure." *Id.*

The Court "has wide latitude to determine the scope of discovery." *Broidy Capital Management LLC v. Benomar*, 944 F.3d 436, 446 (2d Cir. 2019) (internal quotation marks omitted). Accordingly, "[m]otions to compel and motions to quash a subpoena are both 'entrusted to the sound discretion of the district court.'" *In re Fitch, Inc.*, 330 F.3d 104, 108 (2d Cir. 2003) (quoting *United States v. Sanders*, 211 F.3d 711, 720 (2d Cir. 2000)); *see also In re Terrorist Attacks*, 523 F. Supp. 3d at 489 ("The trial court has broad discretion to determine whether a subpoena imposes an undue burden.").

A court can limit "the frequency or extent of discovery" if "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive" or "the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C). "A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1).

### III.    DISCUSSION

#### A. Plaintiffs Fail to Show that Discovery is Relevant or Proportional

*1. The Leagues Are Not Reasonably Comparable or Similar*

"Damages calculations in antitrust cases seek to 'compare plaintiffs' actual experience in the real world with what the plaintiffs' experience would have been, 'but for' the antitrust violation." *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 292 F. Supp. 3d 14, 56 (D.D.C. 2017) (citation omitted). To measure damages in antitrust cases, the yardstick method, a widely accepted method for calculating antitrust damages, "compares profits earned or prices paid by the plaintiff with the corresponding data for a firm or in a market unaffected by the violation." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*, No. 14-md-2542 (VSB), 2025 WL 354671, at *10 (S.D.N.Y. Jan. 30, 2025). "An antitrust plaintiff who uses a yardstick method … bears the burden of demonstrating the reasonable similarity" of the benchmark firm. *El Aguila Food Products Inc. v. Gruma Corp.*, 131 F. App'x 450, 453 n.7 (5th Cir. 2005); *In re Prograf Antitrust Litigation*, No. 11-md-02242 (RWZ), 2014 WL 7641156, at *3 (D. Mass. Dec. 23, 2014) ("Antitrust plaintiffs bear the 'burden of proving comparability' of their proposed yardstick to the but-for world.") (citation omitted). A yardstick analysis fails where the "proposed benchmark is so different from the plaintiff that it cannot serve as the 'corresponding data for a firm or in a market unaffected by the violation' necessary

to support the yardstick analysis." *In re Keurig*, 2025 WL 354671, at *11 (quoting *In re NASDAQ Market-Makers Antitrust Litigation*, 169 F.R.D. 493, 521 (S.D.N.Y. 1996)).

Plaintiffs argue that the information requested "will help [their] damages expert formulate an opinion on the financial terms and revenues NASCAR teams would have received but for NASCAR's unlawful monopolization of premier stock car racing," and that the four categories of information are "plainly relevant" to damages and injury. Doc. 2 at 7, 14; *see* Doc. 36 at 11.

The Court finds that Plaintiffs have failed to show that the information is relevant or proportional because they have failed to show or explain how the Leagues are reasonably comparable or similar to NASCAR for benchmark purposes. Although Plaintiffs repeatedly state that the Leagues are comparable, the extent of Plaintiffs' explanation is that they "are premier professional sport leagues that generate revenue in similar ways." Doc. 2 at 12, 14–15.

Plaintiffs argue that because the Leagues operate without anticompetitive conduct, it follows that Leagues' financial information provides a "benchmark" to "assess the impact of NASCAR's monopolistic conduct and thus the damages to Plaintiffs." *Id.* at 12. However, as the NFL and NBA note, "[t]hat Plaintiffs' expert chose the Leagues as analogies to NASCAR … does not transform irrelevant—and extremely sensitive financial information—into relevant and discoverable evidence. And it … does not satisfy Plaintiffs' burden to demonstrate to this Court how and why this information is relevant." Doc. 29 at 11 (emphases omitted).

Plaintiffs also highlight the differences between NASCAR and the Leagues, which further supports that the Leagues are not reasonably comparable or appropriate benchmarks.[6] Plaintiffs admit that the Leagues are joint ventures owned by teams

---

[6] Plaintiffs have also subpoenaed Formula One and Indy Car, two car racing organizations. *See* Doc. 25 at 9–10; Doc. 27 ¶ 3; Doc. 29 at 12; Doc. 32 ¶ 7. Plaintiffs initiated miscellaneous actions to compel Formula One and Indy Car to comply with third-party subpoenas. *See 2311 Racing LLC et al v. Liberty Media Corporation*, 25-mc-00033 (SKC) (SBP) (D. Colo.); *2311 Racing LL d/b/a 23XI Racing et al v. IndyCar*

7

"unlike NASCAR, which has long been unilaterally controlled by [the] France family." Doc. 2 at 9. In the North Carolina Action, Plaintiffs do not allege that NASCAR would operate as joint venture of its racing teams in their but-for world. *See* Amended Complaint; *see also* Doc. 25 at 14.

The NHL notes other critical differences between the NHL and NASCAR, including that the NHL is unionized and collectively bargains unlike NASCAR. Doc. 25 at 14. Again, in the North Carolina Action, Plaintiffs do not allege that NASCAR drivers would be unionized and collectively bargain with a joint venture in their but-for world. *See* Amended Complaint; *see also* Doc. 25 at 14.

To state the obvious, the Leagues and NASCAR are also different sports with different schedules and structures. For example, "[a] single NHL season includes 1,312 regular season games (with average attendance of 17,500 per game) … [while] [a] single NASCAR season … includes only 36 races, with greater attendance per race." Doc. 25 at 14–15; *see Attendance (1946-47 through 2024-2025)*, NHL, https://records.nhl.com/history/attendance; *see* Amended Complaint ¶¶ 46, 69 (From 2004 to 2014, "seventeen of the top twenty largest-attended United States sporting events [were] NASCAR races."). Plaintiffs do not explain why the Leagues would be an appropriate benchmark despite these critical differences.

  2. *Information is Publicly Available*

Plaintiffs also argue that the information they seek is proportional because (1) "it is [the] best data available for comparing competitive conditions in the 'but for' world" and (2) "Plaintiffs have no other way to obtain comparable and indisputably accurate financial information about these [L]eagues except from the [L]eagues themselves." Doc. 2 at 15. However, Plaintiffs do not dispute that they cannot perform the benchmark analysis without the Leagues' confidential information. As the Leagues argue, Plaintiffs

---

*LLC*, 25-mc-00027 (SEB) (MKK) (S.D. Ind.). Both actions were voluntarily dismissed by Plaintiffs. *See id*.

can find most of the information they seek publicly. *See* Docs. 25 at 18–19; Doc. 29 at 13–16. Here, "it is not the Leagues' burden—as non-parties in a case in which they have no connection—to 'help' Plaintiffs' expert and ensure that the expert has his preferred or 'indisputably accurate' information." Doc. 29 at 15.

### 3. Plaintiffs' Cases Do Not Support Compelling Third Parties for Financial Data with No Connection to the Case

Plaintiffs argue that "courts regularly compel the production of third-party financial data for purposes of assessing the but-for world and evaluating damages, just as Plaintiffs seek to do here." Doc. 36 at 10–11; *see* Doc. 2 at 13.[7] However, the third parties in the cases cited by Plaintiffs had *some* connection to the case, unlike this case. *See, e.g., Direct Purchaser Class Plaintiffs v. Apotex Corp.*, No. 16-mc-62492 (WJZ), 2017 WL 4230124, at *1–2 (S.D. Fla. May 15, 2017) (plaintiffs in the underlying action subpoenaed a third party that directly competed with the defendant in the relevant market and was also impacted by defendant's alleged anticompetitive conduct); *Guy Chemical Co. v. Romaco AG*, 243 F.R.D. 310, 311 (N.D. Ind. 2007) (defendant in the underlying action subpoenaed a third party from whom the plaintiff claimed to lose business).[8] As the Leagues point out, Plaintiffs do not point to any case where a third party "with no business or competitive relationship with the parties to the underlying action, and no relation to the conduct alleged in the complaint, has been compelled to produce … confidential financial and commercial information for the purposes of a plaintiff's damages analysis." Doc. 25 at 21; *see also* Doc. 29 at 15–16.

---

[7] Plaintiffs cite to *Waymo LLC v. Uber Technologies*, No. 17-cv-00939 (WHA) (JSC), 2017 WL 2929439 (N.D. Cal. July 7, 2017), noting that the court granted a "motion to compel financial documents from a third party where they '[were] relevant to [p]laintiff's claim of damages.'" Doc. 2 at 13. However, as the NHL points out, this is an inaccurate representation of the case. Doc. 25 at 19–20. In *Waymo*, the court granted *defendants' motion to compel plaintiff* for documents relevant to plaintiff's claim of damages. 2017 WL 292439, at *2. The court also granted a third party's motion to quash subpoenas. *Id.* at *2–4.

[8] Plaintiffs also cite to *Yankee Bank for Finance & Savings F.S.B. v. Equitable Bank, N.A.*, No. 86-cv-108 (JTE), 1986 WL 12484 (W.D.N.Y. Nov. 6, 1986). However, in that case, the court granted a motion to compel a third party to produce documents where the third party "ha[d] done little to rebut [the movant's] argument that the documents may prove relevant to the issues of fraud, liability[,] and damages." 1986 WL 12484, at *1–2.

9

### B. The Requested Information is Confidential Commercial Information

A subpoena may be quashed—or motion to compel denied—because it requires disclosure of "confidential research, development, or commercial information." Fed. R. Civ. P. 45(d)(3)(B)(i). A non-party resisting discovery based on confidentiality must establish both that the information is confidential and that disclosure would be harmful to it. *American Home Assurance*, 2004 WL 2222148, at *2. Where a party seeks disclosure of confidential commercial information, a court may order production *only if* the serving party satisfies its own burden to show "a substantial need" for the information "that cannot be otherwise met without undue hardship." Fed. R. Civ. P. 45(d)(C)(ii).

Even if the Court had determined that the requested data was relevant and proportional, the Court would quash the subpoenas. Here, the Leagues establish that the information requested is confidential commercial information and that disclosure would be harmful. *See* Doc. 25 at 22–23; Doc. 26 ¶ 9; Doc. 29 at 19; Doc. 30 ¶¶ 6–10; Doc. 31 ¶¶ 6–9.[9] Plaintiffs also do not contest that information requested is confidential commercial information. Doc. 2 at 17. Plaintiffs further have not met their burden of demonstrating a substantial need for the confidential information. Plaintiffs do not argue

---

[9] For example, Thomas Ferree, NHL's Executive Vice President and General Counsel of the NHL, explains in his declaration that the NHL member clubs' "revenue figures are confidential, propriety, and highly sensitive to each NHL member club and … the NHL ... [and] [that] [p]ublic disclosure of this information could commercially harm or negatively impact NHL member clubs [] and … the NHL … by negatively impacting shared revenue figures and potentially jeopardizing the NHL's … contractual dealings with vendors, licensees, sponsors, and other partners." Doc. 26 ¶ 9.

Annie Pell, Senior Counsel at the NFL, explains in her declaration that the NFL regards its salary cap calculation information, which is provided to NFL Players' Association, "as highly confidential and sensitive business information." Doc. 30 ¶¶ 6–8. Pell notes that "the NFL takes care to safeguard and protect against [the] disclosure" of this information—which includes "financial and performance data concerning the NFL and its teams' separate businesses"—"to anyone who does not 'need' to see it for purposes of determining the NFL's salary cap." *Id.* ¶ 9.

Daniel Spillane, the NBA's Executive Vice President and Assistant General Counsel, League Governance & Policy, explains in his declaration that the NBA regards its salary cap calculation information, which is provided to the National Basketball Players Association ("NBPA"), "as highly confidential and sensitive business information." Doc. 31 ¶¶ 6–7. Spillane notes that in connection with the disclosure of this information to the NBPA, the NBPA "is required to sign on an annual basis, a strict confidentiality agreement" and that "[t]hrough that confidentiality agreement, the NBPA acknowledges that [] protections are necessary to protect the NBA and its teams' legitimate interests and that disclosure of the information can result in irreparable injury to the NBA and its teams." *Id.* ¶¶ 8–9.

10

that there is a substantial need for the information and simply note that "[t]he requested financial data from the NFL, NBA, and NHL will *help* Plaintiffs' damages expert formulate an opinion on the financial terms and revenues NASCAR teams would have received but for NASCAR's unlawful monopolization of premier stock car racing." Doc. 2 at 14 (emphasis added).

"[I]n the absence of some showing that the publicly available information . . . is inadequate, the onus is properly on … [the] party to the litigation" to search the publicly available source for the information sought, even if that task is "very burdensome." *Travelers Indemnity Co. v. Metropolitan Life Insurance Co.*, 228 F.R.D. 111, 114 (D. Conn. 2005); *see also U.S. Bank National Association v. Dernier*, No. 2:16-cv-230 (WKS), 2020 WL 13268119, at *1 (D. Vt. Oct. 16, 2020) ("When a party to litigation has ready access to public information, the Court will not require a non-party to obtain and produce such information.").

Here, most of the information that Plaintiffs seek is publicly available. Plaintiffs further do not deny that publicly available information would allow the expert to do their work. *See* Doc. 25 at 19, 26; Doc. 29 at 13–14. Plaintiffs only argue that they have "no other way to obtain comparable and indisputably accurate financial information." Doc. 2 at 15. In fact, Plaintiffs have admitted to the Leagues that "[their] expert *also* intends to rely upon publicly available information in performing his purported analysis." Doc. 32 ¶ 7 (emphasis added). In response to the Leagues' arguments that Plaintiffs should or could rely on publicly available information, Plaintiffs simply argue "[t]he [L]eagues' actual financial data is more authoritative, and will hold more weight with the jury, than online news reporting about the [L]eagues' finances. And NASCAR will undoubtedly challenge the reliability of public reporting." Doc. 36 at 12. Thus, Plaintiffs clearly fail to meet their burden that the discovery sought cannot be "obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C).

The parties also dispute whether the protective order in the North Carolina Action would adequately protect the Leagues' information. Doc. 2 at 17–18, Doc. 25 at 23–25; Doc. 29 at 19–22. However, the Court does not need to address whether the protective order would adequately protect the Leagues' information because Plaintiffs fail to meet their burden of demonstrating a substantial need for the confidential information.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs' motion to compel is DENIED. The Clerk of Court is respectfully directed to terminate the motion, Doc. 1, and close the case.

It is SO ORDERED.

Dated:    June 30, 2025
          New York, New York

                                                                 EDGARDO RAMOS, U.S.D.J.